# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

LEONA MULLINS, INDIVIDUALLY AND        CASE NO.: 1:12CV384
ON BEHALF OF DAVON MULLINS,

        Plaintiffs,                            Judge Michael R. Barrett

     v.

OSCAR CYRANEK,

        Defendant.

## OPINION AND ORDER

This matter is before the Court on the Motion for Summary Judgment of Defendant Oscar Cyranek. (Doc. 28). Plaintiff Leona Mullins has filed a memorandum in opposition. (Doc. 34).[1] Defendant Oscar Cyranek has filed a reply. (Doc. 41). This matter is now ripe for review.

## I.     FACTUAL OVERVIEW

This case concerns the death of sixteen-year-old Davon Mullins in downtown Cincinnati on August 20, 2011.[2] Mullins died after Cincinnati Police Officer Oscar Cyranek discharged his firearm at Mullins. Officer Cyranek has been a police officer with the Cincinnati Police Department since 2006 and he received police training in Cincinnati. (Doc. 27-1, pp. 146, 148).[3]

---

[1] The memorandum in opposition filed by Plaintiff exceeds this Court's page limitations, and no leave of Court has been sought or granted. Local Rule 7.1 sets forth the preference of the Court that memorandum not exceed twenty pages and indicates that a Judge "may impose page limitations in any action by standing order." S.D. Civ. R. 7.1. The Standing Order governing the civil trials of the undersigned provides that memorandum in opposition "shall not exceed twenty pages without first obtaining leave of court." Similarly, the Calendar Order in this case refers counsel to the Standing Orders and states that the "Court will not read beyond 20 pages unless leave has previously been sought and granted." (See Doc. 22, p. 65 n. 2). Defendant points out Plaintiff's lack of compliance in his rely. (Doc. 41, p. 370 n. 1).

[2] By separate Opinion and Order filed contemporaneously, the Court granted Plaintiff's motion to strike the deposition errata sheet provided by Officer Cyranek. The facts contained herein thus do not take into account the changes made in the errata sheet that were disregarded pursuant to that separate Opinion and Order.

[3] Unless otherwise noted, all citations to documents filed with the Court refer to the docket entry number and the PAGEID # provided by the CM/ECF system.

On the day of the shooting, Officer Cyranek was working in uniform for the Cincinnati Police Department. (*Id.* at 149). Officer Cyranek and three other officers had been assigned to provide security outside the Black Family Reunion at Sawyer Point. (*Id.*). While on duty, the officers were informed that an off-duty police officer had reported that some young, African American males were throwing guns over the fence to men who already were inside the event. (*Id.* at 150). Cincinnati Police Officers providing inner security at the event had identified the group of approximately twenty individuals and started moving them towards the gate from inside. (*Id.*). Officer Cyranek and three other officers responded to the gate and attempted to identify those individuals who may have had weapons. (*Id.*). As those individuals exited the gate, however, they ran away towards the downtown city area. (*Id.*). At that time, Officer Cyranek and the others were unable to see any weapons on the individuals, even though they believed one or more of them to be in possession of the weapons. (*Id.* at 151-52). At some point, the officers received reports over the radio that gang signs were being thrown by young people in the area. (*Id.* at 189).

Due to the suspicions of weapons, Officer Cyranek and two other officers got into the police car and went to provide extra security at Government Square and Fountain Square. (Doc. 27-1, p. 152). Officer Cyranek first saw Mullins on Government Square walking from Fountain Square. (*Id.* at 153). Although Officer Cyranek did not recognize Mullins, he recognized the two other individuals with Mullins from Sawyer Point. (*Id.*). Officer Cyranek observed Mullins holding his right side. (*Id.*). While it is not unusual to see young African American males wearing oversize pants without a belt clutching the pants from one side to hold them up, Officer Cyranek testified that he suspected that Mullins had a weapon on him. (Doc. 27-1, p. 153; Doc.

34-1, p. 306).  Yet, Officer Cyranek did not stop Mullins or say anything to Mullins at that time. (*Id.* at 154).

After Mullins walked past Officer Cyranek, Mullins turned around and went back towards Fountain Square, jaywalking across Walnut Street where a few Cincinnati Police Officers were located.  (*Id.*).  When the light changed, Officer Cyranek crossed the street and continued to observe Mullins.  (*Id.* at 154-55).  Officer Cyranek believed that Mullins saw Officer Cyranek observing him from the street.  (*Id.* at 155).  According to Officer Cyranek, each time Mullins saw Officer Cyranek he would move the right side of his body away from Officer Cyranek.  (*Id.*).  Officer Cyranek testified that the movement of Mullins made him even more suspicious that Mullins had a weapon on him.  (*Id.*).  While Mullins continued to walk North on Walnut Street, Officer Cyranek walked towards Fountain Square and then north on Fountain Square.  (*Id.* at 155).  Although the Firearms Discharge Board's review of the shooting indicates that notifying the Emergency Communications Center ("ECC") when investigating suspicious activities is important, it notes that Officer Cyranek did not alert any other officers or radio in any reports of his concerns.  (Doc. 34-1, p. 334).

Officer Cyranek and Mullins met again in the breezeway near Fountain Square, as Officer Cyranek turned into the breezeway from Fountain Square and Mullins entered the breezeway walking towards Fountain Square.  (Doc. 27-1, p. 156).  At that time, Mullins was with Recardo Sims.  (Doc. 34-2, p. 341).  Officer Cyranek testified that he was surprised to see Mullins because most people who have illegal items on them or who did something illegal take off when they see a police officer.  (Doc. 27-1, p. 156).  It was then that Officer Cyranek approached Mullins and told him to stop, a command with which Mullins complied.  (Doc. 27-1, p. 157; Doc. 34-2, p. 341).  Upon approaching Mullins, Officer Cyranek grabbed Mullins' wrists.

3

(Doc. 27-1, p. 157-58).[4]  Officer Cyranek testified that he did so because he suspected Mullins was armed and he did not want Mullins to pull out a gun, fight him, or run away.  (*Id.* at 158-59).

According to Officer Cyranek, Mullins resisted when Officer Cyranek grabbed his wrists. (Doc. 27-1, p. 159).  Officer Cyranek testified that when Mullins resisted, it indicated to Officer Cyranek that Mullins wanted to fight him.  (*Id.* at 160).  Officer Cyranek then pushed Mullins into an L-shaped corner in the breezeway "to make sure that whatever happens that we're all safe, most people are safe."  (*Id.*).  While still holding onto Mullins, Officer Cyranek moved Mullins to the ground where he ended up behind Mullins' back.  (*Id.* at 160-61; Doc. 34-2, p. 341).  With Mullins on the ground, Officer Cyranek tried to control his arms while Mullins was saying something along the lines of "I didn't do anything."  (Doc. 27-1, pp. 160-61; Doc. 34-2, p. 342). Officer Cyranek, however, did not see Mullins' gun at that time.  (Doc. 27-1, p. 161).  Officer Cyranek was able to search one side of Mullins' cargo pants, but was unable to find a weapon. (*Id.* at 162).  Officer Cyranek does not recall much of the conversation that occurred between Mullins and himself during the incident.  (*Id.* at 162).  Officer Cyranek testified that he had a taser on him, but he did not use it because he thought he had good control of Mullins.  (*Id.* at 179); *see also* (Doc. 34-2, p. 342) (Sims avers that Officer Cyranek had control over Mullins).

While Officer Cyranek held Mullins on the ground, Sims approached Mullins and they started talking to each other.  (Doc. 27-1, p. 163; Doc. 34-2, pp. 341-42).  Sims was about two to three feet away from Officer Cyranek.  (Doc. 27-1, p. 163).  Sims did not pull out a weapon and Officer Cyranek does not recall Sims saying anything to him.  (*Id.* at 162-63).  Sims claims, however, that he asked Officer Cyranek what was going on and what Mullins did.  (Doc. 34-2, p.

---

[4] Following the incident, a Criminal Investigation Section ("CIS") interview of Officer Cyranek took place. (Doc. 34-1, pp. 312-13).  During the interview, Officer Cyranek explained how the events unfolded.  (*Id.* at 312-31). In doing so, he indicated that he initially grabbed Mullins' arms from behind.  (*Id.* at 324).  His deposition testimony and the video footage of the incident indicate Mullins and Officer Cyranek were facing one another at the time of the initial approach.  (Doc. 27-1, pp. 157-58).

342).  It was when Officer Cyranek told Sims to back away that Officer Cyranek claims he first noticed a weapon in Mullins' right hand and that Mullins had his finger on the trigger.  (Doc. 27-1, pp. 163, 198).

Officer Cyranek testified that he had his right hand on Mullins' right bicep after Mullins retrieved the gun and he was telling Mullins to drop the gun.  (*Id.* at 163-64).[5]  According to Officer Cyranek, Mullins did not say anything back.  (*Id.*).  Officer Cyranek testified that he lost control of Mullins' right arm because Mullins was pushing and pulling and there was sweat on Mullins' arms and Officer Cyranek's palms.  (*Id.* at 164).  Officer Cyranek testified that when he lost control of Mullins' arm he feared Mullins would shoot him, as Mullins turned his left side of his body towards Officer Cyranek. (*Id.* at 164-66, 168).[6]  Although Officer Cyranek did not see whether the gun was pointed towards him at the time, Officer Cyranek drew his firearm and, as he was in the process of standing up, fired two shots towards Mullins' back.  (*Id.* at 164-67, 183). Officer Cyranek testified that firing two shots was in accordance with his training and that he used his firearm rather than his taser because it became a deadly force situation.  (*Id.* at 169, 179).  According to Officer Cyranek, Mullins threw the gun that he was holding after Officer Cyranek fired those two shots.  (*Id.* at 167).

Plaintiff's interpretation of what occurred once Mullins retrieved the gun differs in several respects.  Plaintiff contends that the video footage shows Mullins leaning to the right rather than turning towards the left.  (Doc. 34, p. 282).  Plaintiff further points to the sworn

---

[5] Sims also avers that Officer Cyranek told Mullins to drop the gun.  (Doc. 34-2, p. 342).

[6] To the extent Plaintiff attempts to create an issue of fact by claiming that Officer Cyranek's testimony was inconsistent on whether he lost control of Mullins' arm (Doc. 34, pp. 281-82; Doc. 34-1, p. 308), that argument is not well taken.  A review of the testimony shows that Officer Cyranek testified that he had control of Mullins' arm but then lost control of it.  (Doc. 27-1, pp. 163-165).  That testimony thus was not inconsistent.

statement of Sims where Sims avers that Officer Cyranek always had control over Mullins,[7] that Mullins threw the gun immediately after Officer Cyranek told him to drop it, and that it was not until after Mullins threw the gun that Officer Cyranek shot Mullins.  (Doc. 34-2, p. 342).[8]  When the shots were fired, Sims ran away from the scene.  (Doc. 27-1, p. 169).  J. Scott Spicer also avers that officers are taught to shoot to stop the aggressive actions towards them or others.  (Doc. 34-1, p. 308).  He states that the correct procedure is to fire, reassess the threat, and then fire again if necessary.  (*Id.*).  He further avers that two shots are appropriate only in a body armor take-down situation, which was not the situation in this case.  (*Id.*).

After firing the two shots, Officer Cyranek stood up and retrieved the gun that Mullins had thrown.  (Doc. 27-1, p. 168).  Officer Cyranek then placed the gun near Mullins' feet.  (*Id.*; Doc. 23-1, p. 79; Doc. 34-2, p. 342).  Officer Cyranek claims to have done so to secure the weapon so that no one else could pick it up and to keep the weapon in plain sight.  (Doc. 27-1, p. 168).  He admits that by doing so he changed the scene of the shooting.  (*Id.* at 170).  Captain Doug Weismann and Sergeant Doug Snider both testified that it was important to immediately secure the gun lying on the ground because as long as the gun was lying on the ground it posed an unsafe situation due to the number of people on and around Fountain Square.  (Doc. 24-1, pp. 97-99, 101; Doc. 23-1, pp. 82-83).  Sims states, however, that there was no one else around except the police who could pick up the gun.  (Doc. 34-2, p. 342).

Shortly thereafter, other officers began to arrive as the civilians near the scene scattered.  (Doc. 27-1, p. 172).  Once they arrived, Officer Cyranek put handcuffs on Mullins.  (*Id.* at 173; Doc. 34-2, p. 342).  Mullins was not moving at that time.  (Doc. 27-1, p. 172; Doc. 34-2, p. 342).  Officer Cyranek was then escorted to a police car parked on Walnut Street, and he told the other

---

[7] However, the video footage shows Officer Cyranek was not able to maintain control over Mullins throughout the encounter.

[8] The video footage of the incident does not clearly show the order of events.

officers to get Sims who had been at the scene. (Doc. 27-1, p. 174). Sims was questioned and then taken to the police station where he signed a statement about the incident. (Doc. 34-2, p. 342).

Following the incident, the Firearms Discharge Board conducted a review of the incident and presented a report. (Doc. 34-1 p. 332). The report notes initially that the Criminal Investigations Section's (CIS) Homicide Unit conducted a criminal investigation and the Professional Standards Section (PSS) conducted an administrative review, and that the Police Department received a letter from the Prosecutor that Officer Cyranek was justified in his actions and did not violate any criminal statutes. (*Id.*). The report went on to consider the incident, the use of force, the tactics used, and the lesser force alternatives available. (*Id.* at 333-34). The FDB determined that Officer Cyranek employed appropriate use of force, employed proper tactics during his initial approach, subsequent struggles and when he discharged his weapon, and that he had no lesser force alternative. (*Id.* at 334). The FDB noted, however, that Officer Cyranek failed to notify the ECC of his situation and location when he became separated from other officers and began to follow Mullins. (*Id.*).

The Hamilton County Coroner conducted an autopsy following Mullins' death. (Doc. 34-1, p. 335). The cause of death was found to be a gunshot wound of the torso with perforation of lungs and aorta. (*Id.* at 336). The manner of death was listed as homicide (shot during police intervention). (*Id.*). The post-mortem examination noted a gunshot entrance wound at the posterior aspect of the left shoulder. (*Id.* at 337). The examination indicated that the "bullet entered the left pleural cavity through the posterior aspect of the left 2nd rib and perforated the upper lobe of the left lung, the descending thoracic aorta, anterior aspect of the 5th thoracic vertebral body, and the upper and lower lobes of the right lung, prior to existing the right pleural

cavity through the posterior aspect of the right 5th rib." (Doc. 34-1, p. 338). "The path this bullet traveled is left to right and downward." (*Id.*). The examination also indicated that Mullins had superficial lacerations on his right forearm, right wrist, and right fingers as well as several contusions on the right elbow. (Doc. 34-1, p. 338).

## II.    <u>LEGAL STANDARD</u>

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" only if its resolution affects the outcome of the suit. *Id.*

On summary judgment, a court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). The moving party has the burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

Once the moving party has met its burden of production, the nonmoving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment. *Anderson*, 477 U.S. at 249. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252. Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

8

III.   <u>ANALYSIS</u>

In the Complaint, Plaintiff asserts three federal causes of action, which include:  1) denial of constitutional rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments and the Ohio Constitution in violation of 42 U.S.C. § 1983 (Count I); 2) use of excessive force in violation of the Fourth Amendment (Count II); and 3) denial of due process in violation of the Fourteenth Amendment and the Ohio Constitution (Count III).  (Doc. 1, pp. 7-8).  Plaintiff also asserts four state causes of action, which include: 1) wrongful death (Count IV); 2) negligence (Count V); 3) assault (Count VI); and 4) battery (Count VII).  (Doc. 1, pp. 9-11).  Officer Cyranek moves to dismiss all of those claims against him.

A.  <u>Federal Claims</u>

Officer Cyranek moves to dismiss all of Plaintiff's federal claims.  (Doc. 28, pp. 217-24). As Plaintiff has not opposed dismissal of the claims in Count I concerning the Fifth, Eighth, and Fourteenth Amendments and the Ohio Constitution or the claims in Count III (*see generally* Doc. 34), Plaintiff has waived those claims.  *See Allstate Ins. Co. v. Global Medical Billing, Inc.*, 520 F. App'x 409, 412 (6th Cir. 2013) (recognizing plaintiff had waived claim by failing to respond to or refute arguments made by the defendants in the district court); *Humphrey v. United States AG Office*, 279 F. App'x 328, 331 (6th Cir. 2008) (holding that the defendant waived any argument on the issue by failing to oppose a motion to dismiss); *Scott v. Tenn.*, 878 F.2d 382 (6th Cir. 1989) (affirming district court's grant of defendant's unopposed motion to dismiss, and noting that "if a plaintiff fails to respond or to otherwise oppose a defendant's motion, then the district court may deem the plaintiff to have waived opposition to the motion").  Thus, the only remaining federal claim to be addressed is for violation of the Fourth Amendment.  (Doc. 34, pp. 18-26).

### 1. <u>Qualified Immunity -- Fourth Amendment Claims</u>

Officer Cyranek seeks to dismiss any Fourth Amendment claims against him on the basis of qualified immunity.[9]  Qualified immunity protects government officials from liability for civil damages under certain circumstances.  The Sixth Circuit generally employs a two-step analysis in evaluating qualified immunity defenses.  *Thacker v. Lawrence County*, 182 F. App'x 464, 469 (6th Cir. 2006) (citing *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310-11 (6th Cir. 2005)).  First, it considers whether a constitutional right has been violated when the allegations are construed in the light most favorable to the injured party.  *Id.*  Second, it considers whether that right was clearly established.  *Id.*  On some occasions, it may be necessary to employ a third step, which is whether the plaintiff "offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.'"  *Id.* at 468 (quoting *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 901 (6th Cir. 2004)).  In some cases, utilizing the third step increases the clarity of the analysis.  *Id.*  In many cases, however, "'if the right is clearly established, the conduct at issue would also be objectively unreasonable'" such that the second and third step are collapsed into a single analysis to avoid duplication.  *Id.* at 469 (quoting *Caudill v. Hollan*, 431 F.3d 900, 911 n. 10 (6th Cir. 2005)).  Qualified immunity "'gives the government officials breathing room to make reasonable but mistaken judgments,'" and "'protects all but the plainly incompetent or those who knowingly violate the law.'"  *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1244 (2012) (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2081 (2011)) (additional internal quotations omitted).  "Plaintiff bears the burden of showing that defendants are not entitled to qualified immunity."  *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009); *see also Burgess v. Fischer*, 735 F.3d 462, 472

---

[9] While it is unclear as to the status of any claims against Officer Cyranek in his official capacity (*see* Doc. 1, p. 4), the following analysis is sufficient to address the individual capacity as well as any official capacity claims.

(6th Cir. 2013) (once qualified immunity is raised, "it is the plaintiff's burden to show that the defendants are not entitled to qualified immunity").

Under that framework, the Court considers whether Plaintiff has met her burden of proving a violation of a clearly established Fourth Amendment right. "A 'seizure' occurs when police detain an individual under circumstances where a reasonable person would not feel free to leave." *United States v. Lopez-Medina*, 461 F.3d 724, 739 (6th Cir. 2006). If the seizure involves a brief investigatory detention and frisk, the Fourth Amendment requires that officers have at least a reasonable suspicion that an individual has committed a crime. *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). The Court must consider the totality of the circumstances when determining whether reasonable suspicion was present. *United States v. Palomino*, 100 F.3d 446, 449 (6th Cir. 1996) (citing *United States v. Knox* 839 F.2d 285, 289 (6th Cir. 1988), *cert. denied*, 490 U.S. 1019 (1989)). "When a seizure rises to the level of a formal or informal arrest, however, it must be supported by probable cause[.]" *Lopez-Medina*, 461 F.3d at 739 (citing *Dunaway v. New York*, 442 U.S. 200, 212-13 (1979)).

An individual who is seized has a right not to be subjected to excessive force. *Graham v. Connor*, 490 U.S. 386, 388, 395 (1989). Whether an officer used excessive force depends on the objective reasonableness of his conduct. *Id.* at 395, 397; *Ciminillo v. Streicher*, 434 F.3d 461, 466 (6th Cir. 2006). The objective reasonableness of a seizure depends upon the totality of the circumstances, including 1) the severity of the crime; 2) the immediacy of the threat posed by the suspect to the officers or others; and 3) whether the suspect is "actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Although police officers must make "split-second" judgments under "tense, uncertain, and rapidly evolving" circumstances, the use of deadly force is reasonable only if "'the officer has probable cause to believe that the

suspect poses a threat of serious physical harm, either to the officer or others.'" *Chappell v. City of Cleveland*, 585 F.3d 901, 908 (6th Cir. 2009) (quoting *Graham*, 490 U.S. at 396-97; *Tennessee v. Garner*, 471 U.S. 1, 7, 11 (1985)). The Court, however, must judge the reasonableness of the conduct from the perspective of a reasonable officer on the scene rather than with the 20/20 vision of hindsight. *Graham*, 490 U.S. at 396; *Untalan v. City of Lorain*, 430 F.3d 312, 314-15 (6th Cir. 2005); *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002). "This standard contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Burchett*, 310 F.3d at 944.

Here, there are two potential "seizures" at issue – the initial stop of Mullins and the shooting of Mullins. *See Chappell,* 585 F.3d at 909 (approving of "segmented" analysis of the separate seizures at issue in the case); *Livermore v. Lubelan*, 476 F.3d 397, 407 (6th Cir. 2007) (indicating need to identify the particular seizures at issue and then examine whether the force used during the seizure was reasonable under the totality of the circumstances). For the reasons explained below, the Court concludes that Officer Cyranek did not violate a clearly established Fourth Amendment right in either instance.[10]

### a. Stop and Frisk

The first seizure concerns the initial stop and frisk conducted by Officer Cyranek. Although Plaintiff does not specifically assert the initial stop and frisk as a separate seizure, the

---

[10] A finding that a constitutional violation occurred is required to deny [individual] defendants qualified immunity and to state a claim of municipal liability." *Estate of Smithers v. City of Flint*, 602 F.3d 758, 767 n. 9 (6th Cir. 2010) (citing *Hills v. Kentucky*, 457 F.3d 583. 587 (6th Cir. 2006); *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001)) (internal citation omitted). "If no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983." *Watkins*, 273 F.3d at 687 (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)); *see also Wilson v. Morgan*, 477 F.3d 326, 339 (6th Cir. 2007). Moreover, without a constitutional violation, Plaintiff cannot successfully obtain the requested declaration that the conduct of Officer Cyranek was unconstitutional or any injunctive relief to restrain any unconstitutional conduct. (*See* Doc. 1, p. 12).

facts alleged and the argument presented are suggestive of such a position. (Doc. 34, pp. 277-81, 291-93). The Court thus considers that seizure here.

The undisputed facts of this case demonstrate that Officer Cyranek had a reasonable suspicion that Mullins was committing a misdemeanor of carrying a concealed weapon in violation of Ohio Rev. Code § 2923.12 so as to justify the initial stop of Mullins.  It is undisputed that Officer Cyranek knew that a group of individuals had reportedly been distributing guns over the fences at Sawyer Point, that some of the individuals involved had headed towards a busy downtown area, and that gang signs reportedly had been thrown.[11]  Officer Cyranek recognized two of the individuals with Mullins from Sawyer Point, even though he did not recognize Mullins himself.  Officer Cyranek also saw Mullins grabbing the right side of his pants, and turning his right side away from Officer Cyranek.  While there may have been an innocent explanation for that action, it also may reasonably have been viewed as a method of concealing a weapon.  *See United States v. Pearce*, 531 F.3d 374, 382 (6th Cir. 2008) (citing *United States v. Arvizu*, 534 U.S. 266, 277 (2002)) (recognizing that for reasonable suspicion to exist, an officer does not need to rule out the possibility of innocent conduct).

Additionally, Officer Cyranek observed Mullins as he walked away from and then back towards a crowded area on Fountain Square.  While Mullins' conduct did not conform exactly to how Officer Cyranek believed individuals usually respond to the presence of police officers when they have done something illegal and he may not have used every tactic he should have when following Mullins, Officer Cyranek had specific information at the time of the stop that Mullins was with those individuals recognized from Sawyer Point and was acting in a way suggestive of carrying a concealed gun as he re-approached Fountain Square.  *See, e.g., United*

---

[11] An officer may develop a reasonable suspicion based on information received from fellow officers. *Alexander v. Hayman*, 254 F. Supp. 2d 820, 833-34 (S.D. Ohio 2003) (citing *Houston v. Doe*, 174 F.3d 809, 814 (6th Cir. 1999); *McPherson v. Kelsey*, 125 F.3d 989, 993-94 (6th Cir. 1997), *cert. denied*, 523 U.S. 1050 (1998)).

*States v. Johnson*, 509 F. App'x 487, 491-93 (6th Cir. 2012) (affirming district court finding that officer had reasonable suspicion where he observed individual who matched description of individual suspected of carrying gun, and the individual walked with an unusual gait and had a bulge protruding in his waistband); *United States v. McDaniel*, 371 F. App'x 617, 620 (6th Cir. 2010) (determining that officer had reasonable suspicion that individual was armed and dangerous where individual appeared startled by officer's presence, turned body away from officer, and made a furtive movement as if putting something into his waistband).  As mentioned previously, the crime of carrying a concealed weapon without a permit falls under Ohio Rev. Code § 2923.12 and generally is a misdemeanor of the first degree unless certain circumstances exist in which case it may be a felony.

As the initial stop of Mullins was proper, the next question is whether Officer Cyranek's subsequent actions were objectively reasonable.  *See Kowolonek v. Moore*, 463 F. App'x 531, 535-36 (6th Cir. 2012).  To answer the question, the Court must consider whether the degree of intrusion was reasonably related in scope to the situation at hand.  *Id.*; *United States v. Lopez-Arias*, 344 F.3d 623, 627 (6th Cir. 2003) (citing *Florida v. Royer*, 460 U.S. 491, 506 (1983)). "Of particular import is whether the officers 'diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.'" *Kowolonek*, 463 F. App'x at 536 (quoting *United States v. Smith*, 594 F.3d 530, 537 (6th Cir. 2010)). "Although 'the scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case,'" law enforcement officers are not permitted to verify their suspicions by using means that transform the investigative stop into a *de facto* arrest.  *Lopez-Arias*, 344 F.3d at 627 (quoting *Royer*, 460 U.S. at 500, 509).  Given that "there is no bright line that distinguishes an investigative detention from an arrest[,]" the Court

14

must consider factors such as "'the transportation of the detainee to another location, significant restraints on the detainee's freedom of movement involving physical confinement or other coercion preventing the detainee from leaving police custody, and the use of weapons or bodily force.'"  *United States v. Lopez-Medina*, 461 F.3d 724, 740 (6th Cir. 2007) (quoting *Lopez-Arias*, 344 F.3d 623).

Here, the totality of the circumstances demonstrates that Officer Cyranek acted objectively reasonably within the bounds of the investigative stop.  The duration of the incident from the initial stop to when Officer Cyranek laid down the gun was just over two minutes.  That short duration cannot be said to be unreasonable.  *See Kowolonek*, 463 F. App'x at 536 (concluding five minute duration for investigative stop was reasonable, and citing other cases where longer stops also were found reasonable).

The use of physical contact to initially restrain and move Mullins did not automatically transform the stop into an arrest.  *Graham*, 490 U.S. at 396 ("Our Fourth Amendment jurisprudence has long recognized that the right to make an . . . investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.") (citing *Terry v. Ohio*, 392 U.S. 1, 22-27 (1968)).  An officer "may move a suspect or use greater force against a suspect, without probable cause, if safety concerns justify such precautions." *Lopez-Medina*, 461 F.3d at 740.  The Sixth Circuit has upheld an officer's use of physical contact (including the use of handcuffs) and minor movements of the individual as reasonably within the scope of an investigative stop where the officer suspected the individual had a weapon.  *See United States v. Townsend*, 206 F. App'x 444, 449 (6th Cir. 2006) (efforts to restrain individual and remove him from vehicle were not more intrusive than necessary where a weapon was in plain view and officers were not sure how a sleeping individual would react to be awoken);

*Radvanksy v. City of Olmsted Falls*, 395 F.3d 291, 309 (6th Cir. 2005) (concluding handcuffing burglary suspect was reasonable to secure the officers' safety where officers suspected he was armed and dangerous); *Houston v. Doe*, 174 F.3d 809, 814-15 (6th Cir. 1999) (holding officers acted within scope of investigatory stop when they pointed weapons at individuals suspected of shooting officers, handcuffed them, and forced them into police cruisers where they believed those individuals may be armed and dangerous).  The use of physical restraints also has been found reasonable when the individual was not suspected of carrying a weapon but resisted, acted aggressively, was non-compliant, or otherwise appeared to present a threat to the officers.  *See, e.g.*, *Kowolonek*, 463 F. App'x at 536 (finding officer justified in using handcuffs on burglary suspect who actively resisted, was visibly upset, and placed his hand on the door behind which an accomplice may have been located); *Slusher v. Carson*, 540 F.3d 449, 456 (6th Cir. 2008) (holding officer reasonably concluded that grabbing the arm and hand of an individual was necessary where the individual was arguing with the officer and refusing to return a court order); *Krantz v. City of Toledo Police Dep't*, 197 F. App'x 446, 453 (6th Cir. 2006) (citing *Houston*, 174 F.3d at 814-15; *United States v. Dotson*, 49 F.3d 227, 230-31 (6th Cir. 1995)) (holding that officers who drew their weapons to effectuate the stop and then, when the plaintiff did not comply, pushed plaintiff against the van, handcuffed him, and held him against the van while the investigation proceeded, reasonably pursued a lawful investigative stop that did not ripen into an arrest).

Here, when Officer Cyranek approached Mullins, he had reasonable suspicion that Mullins was carrying a concealed weapon, had knowledge that gang signs potentially were being thrown in the area, had knowledge Mullins had been with two individuals recognized from Sawyer Point, and was in a public environment in close proximity to a crowded area.  It thus was

not unreasonable for Officer Cyranek to have concerns about his safety or the safety of others. Instead of handcuffing Mullins or escorting Mullins into the police cruiser, however, Officer Cyranek took hold of Mullins' wrists and walked Mullins a short distance to the L-shaped corner in the breezeway. The video footage shows that Officer Cyranek did not use severe force and did not display his weapon at that time. On these facts, Officer Cyranek appears to have acted within the parameters of an investigative stop.

While Officer Cyranek also may have acted within the parameters of an investigative stop had he done what Plaintiff suggests—that is, draw his weapon, order Mullins to comply, and call for backup assistance—that does not make the course of conduct chosen by Officer Cyranek objectively unreasonable under the circumstances. Judging Officer Cyranek's conduct from the perspective of a reasonable officer on the scene rather than with the 20/20 vision of hindsight, the Court finds that Officer Cyranek's decision to peel Mullins away from the other individuals and from the open space using minor restraint was objectively reasonable under the circumstances.[12] While Officer Cyranek may have made mistakes with respect to taking appropriate precautions for his own safety at that time, those mistakes are of little relevance to the determination of whether his actions transformed the investigatory stop into an arrest. *Livermore*, 476 F.3d at 407 (recognizing that the Fourth Amendment prohibits unreasonable seizures only and does not protect against all mistakes made by officers). Plaintiff thus has not

---

[12] Plaintiff does not identify or explain what the potential consequences or risks of the suggested conduct would be under the circumstances or why that conduct would be better suited for the particular circumstances than the conduct chosen by Officer Cyranek. Officer Cyranek testified that he did not display his weapon immediately because he did not want to cause a panic in a crowded area, and did not think it was a great tactic to pull the weapon because he was not going to shoot him. (Doc. 27-1, p. 190). Even if in hindsight Plaintiff's suggested course of conduct could have resulted in a different outcome, that does not make Officer Cyranek's judgment on the scene objectively unreasonable.

identified facts that support a finding that the level of force employed by Officer Cyranek during the initial stop violated his constitutional rights under the Fourth Amendment.[13]

Further, when Officer Cyranek attempted to pat down Mullins in the L-shaped corner, Officer Cyranek was faced with resistance from Mullins, as shown on the video footage. Given that resistance, the potential possession of a weapon, and his reasonable suspicion, Officer Cyranek did not act in an objectively unreasonable manner by continuing to hold Mullins' arms while he resisted and by lowering Mullins down into a position on the ground where Officer Cyranek was able to gain better control over Mullins to further the purposes of the stop.[14] Plaintiff has pointed to no evidence that demonstrates that Officer Cyranek applied more force than necessary at that time to continue to maintain control over Mullins for the pat down.[15] That conduct by Officer Cyranek thus did not violate the Fourth Amendment.[16]

Nevertheless, even if the Court determined that the amount of force applied by Officer Cyranek in the above circumstances constituted a violation of the Fourth Amendment, Officer Cyranek still would be entitled to qualified immunity because Plaintiff has not met her burden of showing that the constitutional right was clearly established. (*See generally* Doc. 34). For a right to be clearly established, "'[t]he contours of the right must be sufficiently clear that a reasonable officer would understand that what he is doing' violates federal law." *Hensley v. Gassman*, 693 F.3d 681, 687 (6th Cir. 2012) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640

---

[13] Notably, Spicer appears to agree that Mullins was not placed under arrest by Officer Cyranek. (Doc. 34-1, p. 311).

[14] It is undisputed that Officer Cyranek checked one side of Mullins' pants for a weapon while in the position in the ground, but was unsuccessful in identifying a weapon at that time.

[15] The post-mortem examination indicates that all of Mullins' abrasions were on his right forearm, right elbow, right wrist and right fingers. (Doc. 34-1, p. 338). It does not indicate any other trauma to Mullins' body during the initial struggle prior to the shooting. (*Id.*).

[16] Spicer suggests that Officer Cyranek actually should have used *higher* levels of force at several points in the encounter with Mullins, although he does not specify the exact points at which such force would have been appropriate. (Doc. 34-1, p. 309-10).

(1987)). While the exact action in question need not have been held unlawful, the unlawfulness must be "apparent from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs." *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003). The critical question is whether it "'would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Slusher*, 540 F.3d at 456 (quoting *Saucier v. Katz*, 553 U.S. 194, 202 (2001)). Here, Plaintiff has not cited to a single case that demonstrates that a reasonable officer would have known that his conduct was unlawful under the circumstances he confronted. *See* (*id.*); *see also Kowolonek*, 463 F. App'x at 537; *Slusher*, 540 F.3d at 456. Moreover, as indicated above, there is no bright line rule as to when an investigatory stop is transformed into an arrest, and Officer Cyranek had a sufficient factual basis for believing he was acting appropriately within the confines of an investigatory stop. Accordingly, Officer Cyranek is entitled to qualified immunity on this basis as well.

### b. Use of Deadly Force

Turning to the second seizure, the Court finds that Officer Cyranek's decision to use deadly force was objectively reasonable under the circumstances. While Plaintiff focuses, in part, on whether Officer Cyranek had a reasonable suspicion in the first instance and whether Officer Cyranek could have prevented the circumstances, the question is not the reasonableness of Officer Cyranek's conduct leading up to the shooting but the reasonableness of the shooting itself. *Chappell*, 585 F.3d at 909; *Livemore*, 476 F.3d at 406. The Court thus must consider only the events immediately preceding Officer Cyranek's use of deadly force to determine whether he is entitled to qualified immunity.

At the outset of the analysis, the Court recognizes that there are several notable factual disputes as to how the incident played out. The first dispute concerns when Mullins threw the

gun.  The second dispute concerns whether Mullins pointed the gun directly at Officer Cyranek. The third dispute concerns Mullins' body position, and the fourth dispute concerns whether Mullins was attempting to comply with Officer Cyranek's commands.  Construing the facts in favor of Plaintiff's position, the Court assumes for the purposes of the summary judgment analysis that Mullins threw the gun before Officer Cyranek fired the two shots at Mullins, that Mullins did not point the gun directly at Officer Cyranek, that Mullins was leaning to his right side, and that Mullins was attempting to comply with Officer Cyranek's commands when he threw the gun.

Even construing those facts in Plaintiff's favor, however, the Court finds that from the perspective of a reasonable officer on the scene, Officer Cyranek had probable cause to believe that Mullins posed a significant threat to his safety or the safety of others.  The video footage shows that Mullins and Officer Cyranek were in close enough proximity to be touching one another and that Mullins was consistently pushing away from Officer Cyranek or otherwise twisting and turning while Officer Cyranek tried to hold on to him.  There is no dispute that Mullins was able to pull out a gun from a concealed location on his person.  Nor has any evidence been presented that contradicts Officer Cyranek's testimony that Mullins held the gun with his finger on the trigger.  Thus, at that time, the severity of the situation had escalated.[17]

At some point, Mullins was able to obtain enough freedom from Officer Cyranek's restraint to throw the gun in the general direction of Officer Cyranek and past Officer Cyranek's

---

[17] It is noted that the removal or attempt at removal of a loaded handgun by a person after the law enforcement officer approaches and before the law enforcement officer leaves without direction from the law enforcement officer to do so raises the severity level of the offense to a felony of the fifth degree.  Ohio Rev. Code § 2923.12(B)(3), (F)(5).  Moreover, an attempt to cause physical harm to another by means of a deadly weapon may fall within Ohio's felonious assault statute.  Ohio Rev. Code § 2903.11.

left shoulder.[18]  Even assuming that action took place before Officer Cyranek fired two shots, the video footage shows that the two events happened in rapid succession.  No evidence has been presented that Officer Cyranek had any warning or notice that Mullins was going to attempt to comply with the command to drop the weapon by throwing the weapon.  As such, Officer Cyranek had to make a quick on-the-spot judgment as to how to respond.  Under these circumstances, the Court cannot find that Officer Cyranek's decision to use deadly force was objectively unreasonable.

The fact that Mullins was not pointing the gun directly at Officer Cyranek, was leaning to the right instead of the left, or was intending to silently comply with Officer Cyranek's commands when he threw the gun do not present genuine issues of material fact that deprive Officer Cyranek of qualified immunity.  In *Chappell*, the Sixth Circuit found similar factual disputes immaterial to the determination of qualified immunity.  There, the decedent was wielding a knife (rather than a gun) when officers entered the room.  *Chappell*, 585 F.3d at 911. The district court denied summary judgment on the basis of qualified immunity because it found, among other things, that it was plausible that the decedent was not pointing the knife blade at the officers and was attempting to comply with, rather than disobey, the officers' commands.  *Id.* at 911-12.  The district court further found that there was a lack of evidence indicating the decedent was given sufficient time to comply with any orders.  *Id.*  On appeal, the Sixth Circuit addressed both holdings.  With respect to whether the decedent pointed the knife towards the officers, the Sixth Circuit held that any factual dispute on that point did not create a genuine issue of material fact because it still was undisputed that the suspect displayed the knife that was formerly concealed, held it up, and continued to move toward the officers with the knife in hand.  *Id.*  The

---

[18] Although Sims asserts that Officer Cyranek always maintained control over Mullins, the video footage shows otherwise.  Moreover, Mullins' ability to retrieve and throw his gun evidences a limitation on Officer Cyranek's control over Mullins.

Sixth Circuit characterized the district court's musing about the significance of the knife's position as the impermissible substitution of the court's own notions about what might have been and the exact "sort of theoretical speculation that the courts are prohibited from engaging in." *Id.* at 912 (citing *Graham*, 490 U.S. at 396-97; *Boyd v. Baeppler*, 215 F.3d 594, 602 (6th Cir. 2000)).  As for whether the decedent intended to comply with the orders, the Sixth Circuit found that such speculation was not sufficient to overcome the perceived threat, explaining that:

> [a]lthough it may be fair to say there is no evidence that [decedent], in the unknown inner workings of his mind, had sufficient time to comply, the record shows that there was sufficient time for the detectives to make observations of [decedent]'s actions—actions that, viewed objectively, strongly indicated his intentions were not innocent and compliant but defiant and hostile . . . [T]he objective reasonableness of the detectives' conduct must be measured in light of what they actually observed in the circumstances confronting them, not in light of speculation that may arise with the benefit of hindsight.

*Chappell*, 585 F.3d at 912 (internal citation omitted).  *See also Livermore*, 476 F.3d at 405-06 (holding officer did not use excessive force when shooting at a suspect to prevent suspect from shooting at another even if the suspect was not aiming the gun at the other person when he was shot because the suspect was in close proximity to the individual while armed with a rifle, had a history of violent behavior, and continued to refuse to surrender and face arrest).

Similar circumstances exist here.  Mullins was able to retrieve the concealed weapon from his person and place his finger on the trigger.  Officer Cyranek did not fire immediately upon seeing the weapon, but instead commanded Mullins to drop the weapon.  Mullins obtained at least some freedom of movement in his right hand but he did not drop the gun.  Instead, he *threw* the gun in the general direction of Officer Cyranek.  The video footage shows that Officer Cyranek had only a split second to react to any movement made by Mullins.  Given the struggle that had ensued between the two of them as reflected on the video footage, their close proximity to one another, and Officer Cyranek's opportunity to assess the threat posed to him by Mullins

22

with the gun in his hand, it was reasonable for Officer Cyranek to believe Mullins' action was hostile rather than compliant and that he was vulnerable to serious or fatal injury under those circumstances. *Chappell*, 585 F.3d at 911-13; *see also Livemore*, 476 F.3d at 306.

Further, Officer Cyranek is not deprived of qualified immunity because he fired two shots, rather than only one shot. While Officer Cyranek's testimony that he acted in line with his training conflicts to some extent with Spicer's averment that two shots are not appropriate except in a body armor take-down situation, Spicer nonetheless acknowledges that officers are taught to shoot to stop aggressive actions towards them or others and may fire again after re-assessing and re-evaluating the situation. Given the minimal distance between Officer Cyranek and Mullins and that fact that Mullins had his finger on the trigger, Officer Cyranek reasonably perceived a threat and any slight hesitation to reassess or reevaluate the threat after the first shot perceivably could have gotten him shot by Mullins if that first shot did not neutralize any threat posed by Mullins. It is notable that the post-mortem examination appears to indicate that there was only one gunshot entrance wound on Mullins even though Officer Cyranek fired twice. Plaintiff has not presented evidence that would show otherwise. While hindsight may suggest that Officer Cyranek's perception of the threat was mistaken, the Court cannot conclude that those facts demonstrate plain incompetence or a knowing violation of the law by Officer Cyranek. *See Chappell*, 585 F.3d at 910 (finding officers entitled to qualified immunity where they shot knife-wielding suspect ten times in a single volley); *Livemore*, 476 F.3d at 407 (finding under the segment analysis that qualified immunity was appropriate for officer who fired two shots during a standoff that killed the individual). The Court therefore defers to Officer Cyranek's on-the-spot judgment and finds that he is entitled to qualified immunity.

### b.  State Claims

23

Under the Political Subdivision Tort Liability Act, as codified in Ohio Revised Code Chapter 2744, individual defendants generally are immune from liability, unless their acts and omissions were "manifestly outside the scope of the employee's employment or official responsibilities" or were taken "with malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev. Code § 2744.03(A)(6).  "Malice" is the "willful and intentional design to injure or harm another, usually seriously, through conduct that is unlawful or unjustified." *Otero v. Wood*, 316 F. Supp. 2d 612, 629 (S.D. Ohio 2004).  "Bad faith" includes a "dishonest purpose, conscious wrongdoing, or breach of a known duty through some ulterior motive." *Id.*  "Wanton misconduct" is defined as "the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is a great probability that harm will result." *Anderson v. City of Massillon*, 134 Ohio St. 3d 380, 388 (2012).  "Reckless conduct" is "characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Id.*

Based on the same analysis presented above with respect to the federal claim, the Court concludes that there are no genuine issues of material fact and that Officer Cyranek is entitled to immunity from liability in connection with Plaintiff's state law claims.  In that same manner in which she has failed to demonstrate that Officer Cyranek's actions were objectively unreasonable, Plaintiff also has failed to show that Officer Cyranek acted with "malicious purpose, in bad faith, or in a wanton or reckless manner." *Chappell*, 585 F.3d at 916 n. 3 (holding that failure to prove objective unreasonableness to avoid qualified immunity under 42 U.S.C. § 1983 also defeated claim for qualified immunity under Ohio law); *see also Kendrierski v. Carney*, No. 22739, 2005-Ohio-6735 ¶¶ 27-31, 2005 Ohio App. LEXIS 6066, at *17-21 (9th App. Dec. 21, 2005) (affirming grant of summary judgment based on qualified immunity under

Ohio Rev. Code § 2744 where officer had probable cause to believe the suspect posed a significant threat of death or physical injury to the officer or others, and use of deadly force was justified).[19]

## IV.  CONCLUSION

For the foregoing reasons, Officer Cyranek's Motion for Summary Judgment (Doc. 28) is **GRANTED**, and all claims asserted against Officer Cyranek in the Complaint are hereby **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED**.

s/Michael R. Barrett
Michael R. Barrett, Judge
United States District Court

---

[19] Moreover, by its very nature, Plaintiff's negligence claim against Officer Cyranek individually cannot stand because negligence is a lower standard than the requisite recklessness required under Ohio Rev. Code § 2744.03(A)(6)(b).  *See Piro v. Franklin Twp.*, 102 Ohio App. 3d 130, 143 (9th App. 1995) (holding that allowing the plaintiff to maintain a tort grounded in negligence against a political subdivision employee would be inconsistent with Ohio Rev. Code § 2744.03(A)(6)(b)).  An official capacity claim also cannot stand due to a lack of municipal liability for intentional torts and a lack of applicable exception to municipal immunity under Ohio Rev. Code § 2744.02.  *See* Ohio Rev. Code § 2744.02; *Price v. Austintown Local Sch. Dist. Bd. of Educ.*, 178 Ohio App. 3d 256, 262 (7th App. 2008); *Barnes v. City of Beachwood*, No. 87100, 2006-Ohio-3948, ¶ 16, 2006 Ohio App. LEXIS 3906 (8th App. Aug. 3, 2006) (citing *Wilson v. Stark Cnty. Dep't of Human Servs.*, 70 Ohio St. 3d 450 (1994)).